IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | * |
| SUZANNE GEARHART and | * CHAPTER 7 |
| CHRISTOPHER GEARHART, | * |
| Debtors | * |
| | * CASE NO. 1:10-bk-00741MDF |
| ROBERTA A. DeANGELIS, | * |
| UNITED STATES TRUSTEE, | * |
| Movant | * |
| | * |
| v. | * |
| | * |
| SUZANNE GEARHART and | * |
| CHRISTOPHER GEARHART, | * |
| Respondents | * |

## OPINION

The United States Trustee (the "UST") has moved to dismiss the bankruptcy petition of Suzanne and Christopher Gearhart ("Debtors") alleging that the totality of Debtors' financial situation demonstrates an abuse of Chapter 7 under 11 U.S.C. § 707(b)(3). For the reasons discussed below, I conclude that granting Debtors relief under Chapter 7 would be an abuse of the provisions of the chapter.

### I. Factual Findings

In July 2006, Debtors purchased a home in Waynesboro, Pennsylvania for $508,000. Christopher Gearhart ("Christopher") had been employed in the pharmaceutical sales field for approximately nine years when Debtors purchased the property. Suzanne Gearhart ("Suzanne") was employed in the medical services sales field. Together they earned approximately $220,000 per year. To finance the purchase of their home, Debtors took out a thirty-year mortgage with monthly payments of $3310. The purchase also required a second mortgage on the home, which was refinanced in June 2008. Through the refinancing, Debtors consolidated consumer debt,

including a motor vehicle loan. After the refinancing, monthly payments on the second mortgage were $385 per month. When they acquired the home in 2006, Debtors had two small children. A third child was born in 2009.

In April 2007, Christopher was laid off from his job, which paid approximately $100,000 per year. His search for new employment in his field was not successful and eventually he started his own business as an independent insurance agent. At the time the schedules were filed, Christopher's insurance business was not generating any net income. In fact, Christopher's business suffered net losses of $7762 in 2008 and $48 in 2009. To make ends meet, both Christopher and Suzanne withdrew funds from their individual retirement accounts, ultimately withdrawing approximately $90,000. After paying taxes and early withdrawal penalties, Debtors netted approximately $62,000, which they used to pay expenses. In January 2009, Suzanne was laid off from her employment. She was rehired in August 2009, but left the company in January 2010 for a more secure position at a comparable salary.

On January 31, 2010, Debtors filed the instant Chapter 7 bankruptcy petition. Their Amended Means Test (Form B22A) reports monthly income of $8577, allowable deductions of $8618, and net monthly income of ($41). Their schedules of income and expenses (I and J) report average monthly income of $5128, monthly expenses of $7301, and net monthly income of ($2172).[1] In their schedules, Debtors estimate that the fair market value of their home is $345,000, with first and second mortgage balances totaling $462,174. Debtors' unsecured debt consists of four credit card accounts in an aggregate amount of $50,109.

---

[1] At the hearing on the within Motion, evidence was introduced that Suzanne's monthly income at her new position is $5762.

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document    Page 2 of 16

On May 25, 2010, the UST filed the motion now before me alleging that Debtors' expenses were excessive, therefore, the case should be dismissed as an abuse of Chapter 7. The particular expenses objected to by the UST include: (1) monthly mortgage payments of $3695[2]; (2) monthly childcare expenses of $540; (3) parochial school tuition payments of $520 per month; and (4) recreational expenditures of $663 per month. Debtors answered the motion, and a hearing was held on June 14, 2010. The matter is ripe for decision.[3]

## II. Discussion

*A. Statutory standard and burden of proof*

Section 707(b) of title 11 requires a bankruptcy court to dismiss a Chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if granting relief would constitute an abuse of the Chapter 7 process. Under § 707(b)(2), the bankruptcy court must presume that granting relief under Chapter 7 will constitute an abuse of the chapter if a debtor's "current monthly income" exceeds allowable expenses in a sufficient amount to enable a debtor to pay a specified amount of debt over a sixty-month period. This mathematical calculation is referred to as the "means test" and is performed by completing Form B22A. When the presumption of abuse does not arise under § 707(b)(2), a case may be dismissed if the court determines that the petition was filed in bad faith or that "the totality of the circumstances . . . of the debtor's financial

---

[2] The UST objected to the first mortgage payment of $3310 per month as being excessive. Because Debtors failed to include on their schedules the monthly second mortgage payment of $385, their actual total monthly mortgage payment is even higher – $3695.

[3] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

situation demonstrates abuse." 11 U.S.C.A. § 707(b)(3). As the Court of Appeals for the Seventh Circuit has held, if a debtor does not pass the means test, it "simply means that the debtor's petition is not *presumed* abusive." *Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161 (7th Cir. 2008). A petition also may be dismissed based on the totality of the circumstances, including consideration of a debtor's actual income and expenses. *Id.* at 1162. Future income and expenses are relevant as well as a debtor's financial condition on the petition date. *In re Lipford*, 397 B.R. 320, 328 (Bankr. M.D. N.C. 2008); *In re Pennington*, 348 B.R. 647, 651 (Bankr. D. Del. 2006).

A debtor's expenses as reported on schedules I and J are not accepted without question; they must be reasonable in light of a debtor's financial circumstances. Debtors must be prepared to do some "financial belt tightening and may be required to forgo amenities to which they had been accustomed." *In re In re McClellan*, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009)(citing *In re Krohn*, 886 F.2d 123, 128 (6th Cir.1989)) (considering "substantial abuse" under former § 707(b) of the Bankruptcy Code). However, debtors are not "expected to live in poverty to pass scrutiny in an action brought to dismiss under § 707(b)(3)." *McClellan*, 428 B.R. at 744 (citing *In re Fulbright*, 319 B.R. 650, 658 (Bankr. D. Mont. 2005)) (other citations omitted)).

Reviewing a debtor's budget to determine whether expenses are "excessive or unreasonable is an unenviable task." *In re Johnson*, 241 B.R. 394, 398 (Bankr. E.D. Tex. 1999) *cited in In re Roppo* ___ B.R. ___, 2010 WL 3602473 (Bankr. N.D. Ill. Sept. 16, 2010). Generally, a bankruptcy court should not substitute its values for those of the debtor. However, there are exceptions. A court should question a debtor's judgment when: "(1) the debtor proposes to use income for luxury goods or services; (2) the debtor proposes to commit a clearly excessive

4

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document      Page 4 of 16

amount to non-luxury goods or services; (3) the debtor proposes to retain a clearly excessive amount of income for discretionary purposes; (4) the debtor proposes expenditures that would not be made but for a desire to avoid payments to unsecured creditors; and (5) the debtor's proposed expenditures as a whole appear to be deliberately inflated and unreasonable." *In re Roppo*. at *5 (citing *In re Navarro*, 83 B.R. 348, 355 (Bankr. E.D. Pa. 1988) (determining disposable income under § 1325(b)).

In a case under § 707(b)(3), the UST bears the burden of proving by a preponderance of the evidence that the filing of the petition constitutes abuse in the totality of the circumstances. *In re Hoffman*, 413 B.R. 191, 194 (Bankr. M.D. Pa. 2008) (citations omitted).[4] The quantum of evidence produced by the UST to meet its burden in this case was meager. To establish its prima facie case, the UST introduced evidence of the Local Housing and Utilities Expenses Standards ("housing allowance") available under the Internal Revenue Service Collection Financial Standards ("IRS Standards") and Debtors' admissions in the pleadings regarding certain monthly expenses. Several bankruptcy courts (this Court is among them) have found the IRS Standards to be useful in establishing a baseline for a family budget when evaluating the totality of the circumstances of a debtor's financial situation, but the guidelines alone do not determine reasonable housing costs. In the means test under § 707(b)(2), the IRS housing allowance operates as a floor, not a ceiling. If a debtor's mortgage payment is higher than the allowance, the debtor is entitled to claim the higher amount. *See* 11 U.S.C. § 707(b)(2)(A). "It would be odd indeed for a value used as a minimum housing allowance to determine whether a presumption of

---

[4]The UST has the burden to establish that the totality of the circumstances of a debtor's financial situation demonstrates abuse. Once a prima facie case is established, the burden of going forward to rebut the prima facie case shifts to the debtor. *Id.*

5

abuse arises under § 707(b)(2) to then be used as a maximum housing allowance to determine whether a case is an abuse under § 707(b)(3)." *In re Lorenca*, 422 B.R. 665, 673 (Bankr. N.D. Ill. 2010). Therefore, the IRS Standards only provide a starting point in the Court's analysis of a debtor's housing expenses.

    B.    *Factors commonly considered in weighing the "totality of the circumstances"*

In each of my prior decisions on motions to dismiss under § 707(b)(3), I have reiterated the statutory standard for establishing abuse – the *totality* of the circumstances. *See In re Ramsay*, Case No. 1:09-bk-06658MDF, 2010 WL 3282654, *8 (Bankr. M.D. Pa. August 12, 2010); *In re MacNamara*, Case No. 1:08-bk-03895MDF, 2009 WL 1606985, *3 (Bank. M.D. Pa. June 5, 2009); *In re Schwenk*, 411 B.R. 211 (Bankr. M.D. Pa. 2009); *In re Hoffman*, supra; *In re Athens*, Case No.: 1-06-bk-02293MDF, 2007 WL 6376132 (Bank. M.D. Pa. August 20, 2007). In *Hoffman*, I noted that in the totality of the circumstances of a given case, dismissal may be warranted on the sole basis that a debtor has the ability to repay some of his debts, but "dismissal is not mandated on this factor alone." *In re Hoffman*, 413 B.R. at 195. Unlike the means test under § 707(b)(2), the totality of the circumstances test "requires a more subjective, holistic assessment of the debtor and his circumstances." *In re Bacardi,* No. 09 B 25757, 2010 WL 54760 at *2-3 (Bankr. N.D. Ill. Jan. 6, 2010).

The totality of the circumstances is determined by examining the following eleven factors that numerous courts have applied to cases under §707(b)(3):

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5)

whether the bankruptcy petition was filed in bad faith; (6) whether the debtor engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities.

*In re Hoffman,* 413 B.R. at 194 (citing *In re Krohn*, 886 F.2d at 126) (other citations omitted).[5]

C. Application of the Krohn *factors to the instant case*

    (1)    *Was Debtors' petition filed due to sudden illness, calamity, disability, or unemployment?*

Debtors' bankruptcy petition was precipitated by periods of unemployment for both Debtors, who lost well-paying jobs during the two-year period before they filed for bankruptcy relief. Unemployment, more than anything else that Debtors did or did not do, forced them into bankruptcy.

    *(2) Did Debtors make consumer purchases far in excess of their ability to repay?*

In determining abuse under this factor, the ability to repay consumer debt should be viewed in a manner consistent with a debtor's financial status and reasonable expectations of repayment at the time debt was incurred. *In re Crink*, 402 B.R. 159, 175 (Bankr. M.D. N.C. 2009). A home is a substantial consumer purchase, and it is appropriate to examine its cost in an inquiry under § 707(b)(3). *See Ramsay, supra.* In *Ramsay*, the debtor purchased a half-million dollar home in a year when his gross reported earnings for federal tax purposes were only $84,000. *Id.* at *1. His wife was unemployed when the home was purchased, and after she

---

[5]Considering the difficulty of negotiating with multiple creditors outside of bankruptcy, this Court has not found factors (9) and (10) to be particularly helpful in its analysis of the totality of the circumstances under § 707(b)(3) in most cases. Therefore, these factors will not be considered in this Opinion.

obtained employment, her annualized salary was only $35,000. *Id.* Thus, in *Ramsay* the total household income was less than $100,000 when the debtor and his former wife purchased a home valued at approximately $500,000. With an annual income of $220,000, Debtors' had significantly higher earnings when they purchased their home. Ramsay began to have difficulty making his mortgage payments after approximately one year in his new home. *Id.* at *4. By contrast, here is no evidence that Debtors experienced any difficulty meeting their monthly mortgage obligations while both were employed. Other than eliciting testimony on the purchase price of Debtors' residence, the UST offered no evidence that Debtors purchased a home beyond their means.

As to other consumer purchases, the UST adduced no evidence that Debtors engaged in lavish spending. In terms of "big ticket items," Debtors' schedules show that they own a 2005 Chrysler minivan and a 2006 GMC Yukon free and clear of liens. In contrast, in *Ramsay*, the debtor purchased two new vehicles – a $58,000 luxury SUV and a minivan – even though his income had been limited to employer-paid disability benefits for a full year prior to the purchase. *Id.* at *2, fn. 6. No instances of unnecessary or extravagant consumer purchases comparable to those in *Ramsey* were alleged by the UST in this case.

        (3)     *Were Debtors' schedules falsified or inaccurate?*

The UST produced no evidence that Debtors' schedules and statements of current income are falsified. Debtors did omit from their schedules the second mortgage payment of $385, but the evidence suggests that this omission was an oversight.

8

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document    Page 8 of 16

> (4) Did Debtors make "eve of bankruptcy" purchases or file their petition in bad faith?

The UST has not alleged that the petition was filed in bad faith or that Debtors engaged in eve of bankruptcy purchases. Far from showing bad faith, Debtors' testimony suggested that the petition was filed in good faith. To bridge the gap between Christopher's jobs, Debtors drew from their retirement savings, incurring substantial tax penalties, in a futile attempt to meet their obligations before they were forced to file for bankruptcy relief.

*(5) Are Debtors eligible for Chapter 13 relief?*

Debtors' income does not exceed the statutory limit for Chapter 13 so they are eligible for relief under that chapter.

*(6) Do Debtors enjoy a stable source of future income?*

Through Suzanne's employment, Debtors enjoy a relatively stable source of future income. There is no evidence that her current position is in jeopardy, but in a recession, few positions are insulated from the effects of an uncertain economy. Christopher's ability to earn income to help support his family is less clear. He is still working to establish his business. If his insurance agency continues to grow and Suzanne retains her position, Debtors' household should enjoy a stable income in the future. But focusing on Debtors' status in the uncertainties of the present economy, this factor is neutral in the Court's analysis.

> (7) Is Debtors' budget excessive or unreasonable and can expenses be reduced?

At this juncture, all of the *Krohn* factors either support a finding that Debtors' petition is not an abuse of Chapter 7 or are neutral. The UST's sole argument in this case is that the filing is abusive because Debtors have the ability to pay at least some of their unsecured debt. Support for

9

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document      Page 9 of 16

this assertion necessarily relies on two of the *Krohn* factors: whether the debtor's proposed family budget is excessive or unreasonable and whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities. These two factors will be analyzed concurrently.

*(a)    Debtors' mortgage expenses*

In *Ramsay*, I noted that "a debtor's budget may be excessive or unreasonable based on a high mortgage payment" and held that Ramsay's case constituted an abuse of the provisions of Chapter 7. *Id. at* \*6 (citations omitted). The facts in *Ramsay* differ from the instant case in several ways: (1) unlike Debtors herein, Ramsay could ill afford his home at the time he purchased it; (2) unlike Debtors herein, Ramsey had one, not three dependents; (3) unlike Debtors herein, Ramsay continued to make lavish purchases even after financial hardship set in; and (4) unlike Debtors herein, Ramsay did not liquidate exempt assets in an effort to stave off bankruptcy. All of these differences are important when evaluating the totality of the circumstances of a debtor's financial situation, but none of these differences has a direct bearing on whether Debtors' mortgage payments are excessive or unreasonable or on whether Debtors' expenses can be reduced.

At the hearing, Christopher admitted that Debtors had no equity in their residence and that they should consider foreclosure.[6] Debtors' valued their residence in their schedules at $345,000. The UST does not assert that Debtors are living in a luxurious home, but argues that they should not be paying more than the amount allowed by the applicable IRS Standards for a

---

[6]After the hearing in this matter, Debtors' first mortgagee, GMAC Mortgage, Inc., filed a motion for relief from the automatic stay that was not opposed by Debtors. An order lifting the stay was entered on July 28, 2010.

10

family of five living in Franklin County, Pennsylvania. The amount allowed for monthly mortgage payments under the IRS Standards is $958, which is significantly less than Debtors' mortgage payments of $3695 per month. Debtors did not dispute the amount of the housing allowance, but countered that because Debtors "passed" the means test under § 707(b)(2), secured debt payments allowed under § 707(b)(2) could not be considered in the Court's analysis of the totality of a debtor's financial situation under § 707(b)(3). As discussed above, under the totality of the circumstances, a court may consider a debtor's actual income and expenses regardless of the result of the means test. *In re Ross-Tousey*, 549 F.3d at 1161-62.

Therefore, I must determine whether Debtors' mortgage payments are unreasonable or excessive. Neither the UST nor Debtors presented any evidence on this issue other than the IRS housing allowance. While the housing allowance is useful as a guideline, it is meager evidence upon which to determine a reasonable housing allowance. However, Debtors offered no other evidence in support of the reasonableness of their housing costs, relying only on their desire to maintain their home. This desire, while understandable, is unrealistic considering their mortgage payments constitute 64% of their monthly income. Therefore, I find that Debtors' mortgage payments are unreasonable and excessive. However, I have little evidence before me to determine what would constitute a reasonable housing expense.[7]

---

[7] Evidence regarding the availability and cost of housing for a family of five in Waynesboro, Franklin County, Pennsylvania is readily available. Census data and real estate rental information through newspapers, magazines and on-line sources could have been presented through the testimony of a real estate expert.

11

### (b) Debtors' child care expense

Debtors incur monthly child care expenses of $540 for three children, ages seven, six, and one.[8] The UST argues that this expense is unnecessary because Christopher's insurance business operates at an annual loss. The UST has provided no case citations to support a *per se* proposition that debtor parents are obliged to discontinue legitimate efforts to develop a business if they are required to incur child care expenses.

The abuse inquiry being a fact-intensive one, a daycare expense that is unreasonable in one case may not be unreasonable in another. It appears that only a few cases have addressed the necessity and reasonableness of daycare expenses in the context of a motion to dismiss under § 707(b)(3). Cases in which child care expenses have been disallowed generally involve situations in which there is a full-time care giver at home. In *In re Dabbas*, No. 00-21217 GEC, 2000 WL 33672948 (Bankr. D. Utah, August 24, 2000), the court found that expenses of over $990 per month for the care of two children was unreasonable when the debtor wife was unemployed and a grandparent lived with the family for six months of the year. *Id.* at *3, fn. 6. *Dabbas* involved a motion to dismiss for "substantial abuse" under former § 707(b) of the Bankruptcy Code. Debtors' situation is markedly dissimilar from the facts in *Dabbas*. Here, both Debtors are working and there is no indication that there are other family members to provide child care. *See also In re Reed*, 422 B.R. 214 (C.D. Cal. 2009) (debtors' $333 per month child care expense unreasonable where wife was unemployed but "looking for work"). Accordingly, I find no evidence of abuse in Debtors' monthly child care expense.

---

[8] It appears that full-time daycare is necessary only for the youngest, as the older two are of school age. Whether the $540 includes after-school care for the older two children is not evident in the record.

*(c.) Private school tuition*

The UST argues that Debtors should not be permitted to send their children to a private elementary school at a cost of $520 per month. Debtors did not explain why they believe this expense to be necessary. "Generally, private school tuition is not a reasonably necessary expense." *In re Watson*, 309 B.R. 652, 660 (BAP 1st Cir. 2004) (considering tuition in "disposable income" context under § 1325(b)) (citing *In re Webb,* 262 B.R. 685, 690 (Bankr. E.D. Tex. 2001); *Univest-Coppell Village, Ltd. v. Nelson,* 204 B.R. 497 (E.D. Tex. 1996)). In *Watson*, the court found that private school tuition for minor children was not a reasonable and necessary expense when the debtors failed to demonstrate that the local public school was not an adequate alternative. *Id.* 309 B.R. at 661. The court further held that the debtors' "strongly held religious beliefs" were an insufficient basis for finding that the expense was reasonable or necessary. *Id.*

The court in *In re Savoie*, No. 05-13263DWS, 2006 WL 893610 (Bankr. E.D. Pa. March 9, 2006) cited *Watson* in sustaining a UST's motion to dismiss a Chapter 7 case for substantial abuse. "In the bankruptcy context, absent a special need ( *i.e.,* physical or mental disabilities, religion, etc.), there is no justification for such a significant expense when a debtor's creditors will remain unpaid. Otherwise, the creditors would be, in effect, forced to fund a private school education for the debtor's child." *Id.* (citing *In re Watson*, 309 B.R. at 662).

In light of these decisions, and absent any showing by Debtors that their choice of private schooling is anything more than a personal preference, I conclude that their payment of private school tuition is unreasonable.

13

*(d.) Recreational expenses*

Debtors' schedule of expenses indicates that they expend $663 per month for recreation. However, Debtors testified that their current spending for recreation is "virtually nil at this point." (N.T. 34.) Finding that the Debtors do not expend $663 per month for recreation, I obviously must conclude that there is no evidence of abuse in the expenditure because it is not actually expended. Of course, the effect of this finding is that Debtors' monthly budget deficit as reported on schedule J is actually $1509, not $2172.

D. *Debtors' ability to repay their debts*

The UST asserts that if Debtors' expenses were reduced to a reasonable level, they could repay a significant amount of their unsecured debt; therefore, their petition constitutes an abuse under Chapter 7. Debtors' private school tuition payments should be eliminated and the amount claimed for recreational expenses should include to a more modest amount of $100 per month, which would reduce Debtors' monthly expenses to $6218. Considering Debtors' current income is $5762, there still is no disposable income to commit to a Chapter 13 plan unless Debtors' housing expenses are reduced.

As I discussed above, Debtors current mortgage payment of $3695 is unreasonable. However, unlike tuition at a private school, this is not an expense that can be eliminated. A home for Debtors' family is a necessity. If Debtors surrender their current home and move into a rental unit, the amount of rent they are required to pay will determine how much they would have available to fund a Chapter 13 plan. When a mortgage payment is too high, a more reasonable amount will be used to calculate whether a debtor has disposable income available that could be committed to funding a Chapter 13 plan. *See, e.g., In re Welch*, 344 B.R. 50, 55 (Bankr. M.D.

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document      Page 14 of 16

Pa. 2005) (debtors expected to reduce $2712 mortgage payment where applicable IRS standard for debtors was $918); *In re Hoffman*, 413 B.R. at 197 (debtor compelled to reduce $2338 monthly housing expense where applicable IRS standard was $983); *In re MacNamara*, 2009 WL 1606985, at *4 (debtors who were paying more than 30% of their income on housing and whose monthly payments were more than four times greater than applicable IRS standard could be expected to find suitable rental housing). If I assume that Debtors can obtain housing at twice the IRS Standard of $985 ($1960), Debtors will have monthly disposable income of $911. Therefore, while the lack of evidence in this case makes a precise calculation impossible, Debtors do have the ability to pay a meaningful amount to satisfy the claims of their unsecured creditors.

### III. Conclusion

In examining the totality of the circumstances of Debtors' financial situation, the Court finds that two *Krohn* factors support a finding of abuse. First, Debtors' budget is excessive, particularly expenses for recreation (as budgeted), private tuition, and housing. Second, Debtors are able to reduce their expenditures while adequately providing for the needs of their family. If the private tuition expense is eliminated and the expenses for recreation and housing are reduced to reasonable amounts, Debtors will be able to provide their family with adequate food, clothing, shelter, and other necessities while making significant payments each month into a Chapter 13 plan. With reasonable belt-tightening, Debtors can maintain a comfortable lifestyle while partially satisfying the claims of unsecured creditors. While dismissal is not mandated on this finding alone, I find it to be appropriate in this case to order that unless Debtors choose to convert their case to Chapter 13, the case will be dismissed.

15

Case 1:10-bk-00741-MDF    Doc 25    Filed 11/22/10    Entered 11/23/10 11:01:46    Desc
Main Document      Page 15 of 16

An appropriate Order will follow.

By the Court,

_Mary D. France_
Chief Bankruptcy Judge

Date: November 22, 2010

16